CITY OF BUFFALO v. DELAWARE, L. & W. R. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. May 13, 1908.)

RAILROADS—CONSTRUCTION OF BRIDGES—INJUNCTION.

A city granted a franchise to a railroad company to construct and maintain a railroad bridge across a river. The company accepted the franchise and constructed a bridge in compliance with the terms of the grant. The company leased its road, and the lessee used the bridge as a part of its main line. The company and the lessee, because of the insufficiency of the bridge, proposed to erect a new fixed bridge on the abutments of the old one. The city demanded the construction of a drawbridge, the cost of which would greatly exceed the cost of a fixed bridge. A plan of the city for altering the river provided for the alteration of the course of the river at the point where the bridge was to be constructed, which would leave only a disused channel under such bridge. *Held*, that it would be inequitable to require the construction of a drawbridge, and an injunction restraining the construction of a fixed bridge should be dissolved.

Appeal from Special Term, Erie County.

Action by the city of Buffalo against the Delaware, Lackawanna & Western Railroad Company and another. From a judgment for plaintiff rendered on a decision after a trial, and from an order denying a motion to vacate a temporary injunction, defendants appeal. Judgment and order reversed.

The action was commenced on the 4th day of September, 1907, to procure an adjudication that a certain "plate girder fixed bridge" which the defendants are engaged in constructing across the Buffalo river, where the railroad of the defendants crosses said river northeasterly of Abbott Road in the city of Buffalo, and which new bridge is to take the place of and be substituted for the bridge now crossing said river, which is used, owned, and operated by the defendants, constitutes an unlawful structure, and is a nuisance; that the defendants be directed to remove any and all parts of said new bridge already in place, and be perpetually enjoined from building or constructing such new permanent fixed bridge across said river; and that a temporary injunction may issue restraining the defendants from erecting said bridge during the pendency of this action. Such temporary injunction was granted. A motion was made by the defendants to vacate the same, which was denied, and an order entered to that effect. The action was thereafter tried upon the merits, and final judgment was entered, which awarded to the plaintiff practically the relief demanded in the complaint. From the final judgment so entered this appeal is taken. The defendants also seek to bring up for review the order heretofore entered denying their motion to vacate the temporary injunction, and ask that such temporary injunction be now vacated.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Louis L. Babcock, for appellants.
Samuel F. Moran, for respondent.

McLENNAN, P. J. The Buffalo river, in an irregular course, flows in and through the city of Buffalo, emptying into Lake Erie, near the source of the Niagara river. The defendants, as lessor and lessee, respectively, own and operate a railroad entering into the plaintiff city. In the year 1881 the plaintiff, as it was duly authorized to do, granted a franchise to the defendant, the New York, Lackawanna & Western Railway Company to construct and maintain two bridges across said

river for the purposes of its railroad. Such franchise was accepted by the defendant, and it constructed said bridges, complying in all respects with the terms of said grant. The trial court has found:

"That all the work performed by said railway company in and about such structure was performed in the manner specified in such resolution and pursuant to the conditions thereof, and that each of the defendants herein have in all respects complied with all the terms and conditions of such resolution and grant."

Also the court found:

"That said bridges were constructed in all respects in conformity to the grant."

Such grant contained no limitation as to the time of its enjoyment. One of the bridges so constructed, and which is the subject of this controversy, constitutes a portion of defendants' main line through said city, and ever since it was built it has been used and occupied by said railroad company as such, and in all respects in accordance with the terms of such grant. After the construction of the bridge in question, the New York, Lackawanna & Western Railway Company leased its railroad to its codefendant, which latter company has ever since operated and is now operating the same, using such bridge as a part of its main line. It appears and the court has found:

"That by reason of the age of said bridges, and by reason of the fact that the defendant the Delaware, Lackawanna & Western Railroad Company is now engaged in operating over its said railroad equipment of heavier tonnage than formerly, and that the volume of its traffic has from time to time largely increased, it has become necessary for the defendants herein, in order to safeguard its said traffic and to protect the safety of the persons and property which it transports as a common carrier, to replace said bridges originally constructed with more modern and heavier bridge structures."

And it is further found as a fact that the state of New York, through its proper officers, has directed the defendants to replace the bridge in question with a more modern and safer structure. Because of such direction, or upon its own initiative and before the commencement of this action, the defendant lessee undertook to construct in the place of the bridge originally constructed what is known as a "plate girder fixed bridge," being much heavier and stronger than the old bridge, and concededly in all respects suitable to enable the defendant to carry on its business at that point with safety to itself and to the public. It is proposed by the defendants to place such new bridge on the abutments which the old bridge rests upon, and so as not in any manner to interfere with the channel of the river further than it is already interfered with by the old structure. The plaintiff concedes the defendants' right to maintain a bridge across Buffalo river at the place in question, but insists that any new bridge which may be erected should be provided with a swing or draw, irrespective of the necessity for such kind of structure, either at the present time or in the future, and that such new structure must be approved by the common council of the plaintiff. It is over that contention on the part of the plaintiff that this controversy arises.

It appears that the plaintiff adopted a plan, which, we will assume, it was authorized to do, to straighten, deepen, and make navigable the

Buffalo river from its outlet into Lake Erie to a point beyond the bridge in question. Such plan, however, provides that the channel of the river·shall be changed at the point in question, and shall be located 500 feet northeasterly from the existing channel, where it is crossed by the defendants' railroad, and it appears that such plan has been approved by the Secretary of War, acting under the provisions of the act of Congress of March 3, 1899. If such plan is carried out and the proposed change of location of such channel is made, it is apparent that an additional bridge will be required to be constructed across such new or changed channel, in order to enable the defendants to maintain and operate the main line of their railroad in and through the city of Buffalo. Upon the evidence it cannot be claimed that there is any intention on the part of the plaintiff to provide a channel at the place where the present bridge of the defendant is located so as to require a draw or swing bridge at that place. There is nothing in the evidence to indicate that, if a swing or draw was provided, it would ever be used. Indeed, it appears conclusively that such swing or draw would not be used, because, as we have seen, the plan, and the only plan, proposed by which the river is to be made navigable, in fact involves a change of its channel to a distance of 500 feet northeasterly from where the bridge in question is located. It is claimed by the plaintiff that the Buffalo river has been declared by act of Congress to be a navigable waterway of the United States, and is a highway of commerce and navigation between ports and points of the several states of the United States, as well as of foreign countries. It is demonstrated by the evidence in this case that as matter of fact such river is not now a navigable highway of commerce at the point where it is proposed by the defendants to reconstruct the bridge in question. It may become navigable in fact if the channel is changed and greatly deepened and numerous other obstructions removed, some of which have been erected and are maintained by the plaintiff itself. It can hardly be claimed that by the act of Congress referred to, when the United States has approved the plan prepared and submitted by the plaintiff, which involves the construction of a new channel for the Buffalo river for a considerable distance and the abandonment of a corresponding portion of the old channel, because not suitable to be made navigable in fact and a highway of commerce, it is given the right to retain jurisdiction over such abandoned portion, and so as to prescribe the kind of structures which may be erected and maintained across the same. The United States is only interested in the navigability of the river, and is not concerned with any structures not involved in that proposition. The trial court has found:

"That, if said plan 'C' [which is the plan involving the change of the channel] is ever carried out in accordance therewith, the said channel of Buffalo river, over which defendants heretofore constructed and now maintain the bridge above referred to, will be separated from the navigable channel of Buffalo river proposed to be established in pursuance thereof, and that the portion of said Buffalo river over which the said defendants' bridge is now located will be either a disused channel of said river or will be left in such condition as not to be navigable."

It appears that the federal authorities have expressly refused to interfere with the bridges already existing across said river. In answer·

to a petition of various residents of the city of Buffalo presented to the Secretary of War on September 7, 1904, the acting secretary replied as follows:

"I beg to inform you that, as the result of a very thorough investigation of this subject by the engineer department of the army, the department concurs in the opinion of the chief of engineers that it does not appear justifiable to order at this time alterations in these bridges in order to permit a future improvement of this waterway by the city in the interest of a commerce which cannot exist until the improvement has been made. While it would undoubtedly be a great public improvement for the city of Buffalo to develop the upper portion of this river for the use of lake vessels, and if such improvement be made its full use will require that all bridges be provided with draws, it is concluded that no action by the War Department is necessary or advisable at the present time in the direction of this petition."

The act of Congress of 1899 (Act March 3, 1899, c. 425, 30 Stat. 1121) points out a procedure whereby the federal government, if it elects to intervene, can compel bridges to be remodeled to accommodate navigation. It provides for a hearing before the Secretary of War and the matter is determined in a quasi judicial way by the Secretary, and an appeal lies from his decision. There is no claim in this case that the federal authorities have assumed in any manner to assert the powers given by the act of Congress referred to, whatever they may be, and the plaintiff is in no manner authorized to enforce any rights given by such act for and on behalf of the federal authorities. We fail to discover how the act of Congress or the action of the federal authorities in the premises can have any possible bearing upon the issues involved in this action, especially in view of the refusal by the Secretary of War to interfere. By such "act" or action, no right accrued to the plaintiff which it is authorized to enforce in this action. If it shall become necessary to determine the rights of all parties interested upon the theory that the river in question is navigable in fact and is a public highway, involving interstate commerce, and the United States shall seek to exercise its powers in the premises, it will then be time to settle and determine, in the proper forum, the extent of such powers and the rights of all the parties interested, and which result from the acts of Congress pertaining to the subject-matter. No question as to the right of the United States to regulate and control the manner in which the defendants shall exercise the rights acquired under their franchise is now involved, and any judgment which may be finally rendered in this action can in no manner affect the rights of the United States in the premises.

The only remaining question which need be considered is: What rights did the defendant lessor acquire under the franchise granted to it in 1881, which it accepted in accordance with the terms of such grant? Such bridge was erected at a large cost. The defendants' railroad was necessarily constructed in and through the city of Buffalo with reference to it and to its location. It is practically conceded that the erection of a swing or draw bridge will cost much more than a fixed plate girder bridge, such as the defendants are seeking to build, and that the latter would better and more safely accommodate its business. That the franchise in question became a contract between the city of Buffalo and the defendants, when accepted, is well settled by authority.

In the case of Mayor, etc., v. Troy & Lansingburgh Railroad Company, 49 N. Y. 657, it was held:

"By the acceptance by a railroad corporation of a license from a municipal corporation to lay and operate its tracks in the streets of the latter, the terms and conditions upon which the license is granted became a contract between the parties."

It is equally well settled that such a contract constitutes a property right of which a party may not be deprived without due process of law. People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684. The above propositions are elementary, and are not controverted by the respondent, but it contends in this regard, in substance, that the defendant company did not acquire a franchise to perpetually maintain a bridge of the character which it was originally authorized to construct. No right to revoke was expressly reserved by the terms of the grant and such right of revocation will not be implied, unless clearly intended. We think it would be unreasonable to hold that the parties intended that the franchise should terminate when the bridge originally constructed should become worn out or unsuitable for the conduct of defendants' business because of changed conditions, or that upon the happening of such event an additional and unnecessary burden could be imposed by the city upon the defendants by requiring them to erect a bridge with a swing or draw, entirely different in character and largely increasing the cost. It should be borne in mind that the bridge which the defendants are seeking to erect is for all practical purposes like the one originally constructed. Its purpose and general character are the same. It is proposed to build it upon the same piers or abutments, and so as not in any manner to further interfere with the channel of the river or the flow of water therein. If a particular part or portion of the original bridge had become broken or decayed, it would hardly be contended that the defendants, under the grant, would not have the right to replace the same. I can see no difference in principle when, as found by the court, the entire superstructure, by reason of age and decay, has become unsuitable and unsafe for the conduct of the business for which it was intended. If, a week after the old bridge had been completed and the defendant had constructed its railroad in and through the city so as to make it necessary to cross the river at that point, it had been destroyed by fire, wind, flood, or otherwise, would the plaintiff have had the right under the grant to prevent the erection of another similar structure at the place in question, or could it have compelled the defendants to erect a swing or draw bridge to take the place of the one destroyed, at perhaps double the cost? If not, it is because such grant given by the plaintiff and accepted by the defendants made a contract, binding upon both parties and irrevocable, and because the right given by such grant to the defendants "to maintain" carried with it the right to renew and to rebuild. That such is the fair meaning and proper interpretation of such grant is amply supported by authority. In the case of the State of Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. (U. S.) 421, 15 L. Ed. 435, it was held, in substance, that the defendant, having been authorized by act of Congress to build and maintain a bridge of a certain character across the Ohio river, which it did, and which was

blown down and destroyed, it had the right to build in its place another of similar character. In the case of United States v. Railroad Company (C. C.) 134 Fed. 969, it was held:

"The right of a railroad company to maintain a bridge across the Ohio river, lawfully built under an act of Congress, includes the right to repair the same, when necessary to its safe use, without substantially changing the structure; and a court will not, at suit of the United States, enjoin the replacing of the superstructure by a new one resting on the same piers, where such rebuilding in no manner increases the obstruction to navigation."

In the case of the United States v. Railroad Company, 134 Fed. 353, 67 C. C. A. 335, decided by the Circuit Court of Appeals of the Sixth Circuit, the syllabus is as follows:

"A grant by a state to a railroad company of authority to build and maintain a bridge across a river for the use of its road, without restriction as to time, or the materials of which it should be constructed, authorizes the company to renew parts of the bridge from time to time for the purpose of maintaining it or better adapting it to the exigencies of business, without substantial change in its form, whether it be done with the same or some other suitable material. Defendant railroad company built a bridge for its road across Muskingum river under authority given by the state of Ohio, which then exercised control over the river. Subsequently the state transferred its rights in the river to the United States, which accepted the same. By Act April 2, 1888, c. 53, 25 Stat. 74, Congress prescribed regulations to govern the building of bridges across the river between certain points, requiring any bridge thereafter erected to have at least one channel span of stated width and stated height above the water, and provided that any person or corporation having lawful authority 'may hereafter erect bridges across said river for railroad or other uses upon compliance with the provisions and requirements of this act,' but not otherwise. Held, that the word 'bridge,' as used in the act, comprehended not only the span or roadway, but also the abutments and piers upon which it was supported, and that the replacing by defendant of the wooden superstructure of its bridge, which had become unsafe from decay and long use, by a new superstructure of iron, did not constitute the erection of a new bridge, so as to bring it within the provisions of the act."

In the case of United States v. Railroad Company, 143 Fed. 224, 74 C. C. A. 354, where it was sought to restrain the defendant from renewing the superstructure of a bridge across Ohio river, it was held:

"The right of a railroad company which constructed a bridge over a navigable stream, in conformity to the requirements of an act of Congress authorizing the same to maintain such bridge as a lawful structure, includes the right to repair or to renew the superstructure when necessary to its safe use, and, where it is at all times, both during and after the alteration, kept and maintained in conformity to the act, the courts have no power to enjoin the work or to abate the structure as a nuisance, on the ground that it is an unlawful obstruction to navigation. A railroad bridge over a navigable stream, built under authority of an act of Congress which contained no reservation as to repeal, modification, or alteration, can only be required to be removed or replaced by a new bridge constructed, in accordance with Act March 3, 1899, c. 425, 30 Stat. 1121, by an act of Congress authorizing the same and providing for just compensation."

In that case, at page 226 of 143 Fed., page 356 of 74 C. C. A., the court said:

"The superstructure of this bridge, which was made lawful by the act of 1862, and approved by the government engineers as being a 'lawful structure,' in the course of time became worn out to such an extent as to render its renewal necessary in order to insure the safety of passengers and the transportation of commerce. From the time of the erection of the bridge un-

der the act of 1862 until the filing of the bill in this case there was no objection made as to the manner of its construction. It is therefore necessary that we should determine whether the acts complained of are such as to justify the contention that the appellees are constructing a new bridge. The piers as originally constructed remain intact and occupy the same relative position as when originally constructed in conformity with the act of Congress and approved by the government engineers as a 'lawful structure,' and the only change that has been made is the renewal of the superstructure, the erection of which affords every facility for navigation which was enjoyed when the original superstructure was placed on the piers. If the building of the superstructure can be held to be the erection of a new bridge, then the removal of cross-ties and the substitution of new rails could also be held to be prohibited by the act of 1899."

No case has been called to our attention in which it has been held or intimated that where a franchise, unlimited as to time, is lawfully granted by a municipality to a railroad company, authorizing it to build and maintain a bridge for the purpose of its railroad, such grant does not confer the right to renew such structure, or, in case it becomes worn out or is destroyed, to rebuild another in its place of like character, if thereby no additional burden is cast upon such municipality. We conclude that, by the terms of the franchise in question, its acceptance by the defendant, and the acts done by it in pursuance thereof, a binding contract was made between such defendant and the plaintiff, which constituted a valuable property right, and which not only authorized the defendant to construct the original bridge, but to renew it whenever necessary and when worn out to construct another of the same character in its place, without, however, imposing any additional burden upon the plaintiff because of the construction of such new bridge.

It is urged, however, on behalf of the respondent, that the Legislature by the enactment of section 404 of the revised charter of the plaintiff, being chapter 105, p. 223, Laws 1891, has modified or curtailed the rights of the defendants in the premises; that by such enactment the defendant was deprived of the right to substitute in place of the worn-out superstructure of the old bridge a new and modern superstructure, and which would be suitable and safe for the conduct of its business. The section of the charter is as follows:

"Buffalo river, within the city, is a public highway, but any bridge heretofore built and now existing over the same and any swing or draw bridge hereafter built over the same, within the city, by authority of the common council, is a lawful structure."

It is urged that, if the new superstructure is substituted in the place of the old, the bridge would not be an existing bridge within the meaning of the statute. We think such is not a correct interpretation of the meaning of the section, but, if so, and if we are right in the interpretation of the meaning of the franchise, of its acceptance, and of the acts done in pursuance thereof, then this section of the charter is clearly void because unconstitutional, in that it would deprive the defendants of valuable property rights without due process of law. By the section of the charter, the Legislature recognized the bridge in question as a lawful structure. Its lawful character continued, notwithstanding any repairs which might have been put upon it, even to the extent of substituting a new superstructure for the old one. The Leg-

islature did not intended to interfere with existing structures at all. The bridge in question, within the meaning of the "act" and of the authorities, is an existing structure whether it remains precisely as originally constructed, or whether a new superstructure shall take the place of the old. Neither did it intend to interfere with valid and existing grants. The Legislature only intended to prevent the erection of additional fixed bridges. As suggested by appellants' counsel, the meaning and scope of the franchise given by the city and as practically construed by it is in direct conflict with its present contention. After the charter provision was passed in 1891, the city authorized the construction of two fixed bridges across the river in the vicinity in question for its purposes and the accommodation of the public, and no action has been taken by the plaintiff looking to the removal of such structure or providing them with draws, which would be quite as essential to the navigability of the river at the place in question as would be the change which the plaintiff is seeking to compel the defendants to make in their existing bridge. But, in addition, we conclude that the claim of the plaintiff is wholly without merit; that upon the undisputed facts a court of equity ought not to perpetually enjoin the defendant from prosecuting to completion a work which is necessary to "safeguard its said traffic and to protect the safety of the persons and property which it transports as a common carrier." The river at the place in question is not navigable in fact. If the only plan which has been suggested for making it navigable as a whole is carried out, the portion involved in this controversy will be abandoned. There is no pretense that if the bridge in question is provided with a draw that it will probably ever be opened. At the most, whether or not a draw or swing if put in the bridge in question would ever be used is the merest speculation. The evidence is not sufficient upon which to base a judgment depriving the defendants of a valuable property right, to wit, the right to put a new and modern superstructure, suitable for the proper conduct of its business, upon its existing bridge.

We conclude that the judgment and order appealed from should be reversed, and a new trial granted upon questions of law and fact, with costs to appellants to abide event, and that the temporary injunction granted herein should be vacated, with $10 costs.

Judgment and order reversed and new trial granted upon questions of law and of fact, with costs to appellants to abide event, and temporary injunction vacated, with $10 costs. All concur.

SPRING, J. (concurring). We all agree that the judgment appealed from should be reversed, but are at variance over the reasons therefor. The only plan presented by the plaintiff for straightening and enlarging the channel of the river provides for altering its course so that the channel at the point now crossed by the defendant's track will not be used at all, but will be abandoned. If that plan is to be developed, the bridge which the defendant is enjoined from erecting would be no obstruction. It would therefore be inequitable to require defendant, under the present conditions, to incur the largely increased expense of erecting and maintaining at this point a swing or draw bridge. The injunction should be vacated, as it is important to the defendant that

the bridge should be speedily constructed. We do not determine the other questions discussed, nor do we hold that the defendant may not be required to remove the fixed bridge, if constructed, in case it becomes an obstacle to the development of the river. None of these questions may ever arise in a practical way, and there is no necessity of deciding them now. The ultimate rights of the parties will not be affected by the judgment now ordered.

Judgment reversed and new trial granted on the law and facts, with costs to appellant to abide the event.

WILLIAMS, KRUSE, and ROBSON, JJ., concur.