CITY OF BUFFALO v. DELAWARE, L. & W. R. CO. et al.

(Supreme Court, Appellate Division, Fourth Department.   January 12, 1910.)

1. NAVIGABLE WATERS (§ 20*)—BRIDGES—FRANCHISES.

A grant by the city of Buffalo to a railroad to lay tracks across its streets and over the Buffalo river, declared by the city charter to be a public highway, and in fact a navigable waterway of the United States, without imposing any condition as to the kind of bridge over the river, save that its approaches must leave such openings as will be sufficient to readily pass the waters of the river, is not a grant of the right to perpetually maintain a fixed bridge over the river, regardless of the requirements of the public in the use of the river as a highway for commerce, but the right is on the implied condition that the railroad may build its bridge over the river subject to the future requirements of the public use, and there remains in the state the right to improve the river and make it more serviceable as a public highway, and the railroad must meet all reasonable requirements of the state from time to time as conditions change and the public use of the river increases, and, where the bridge erected under the grant has become unfit for railroad use, the railroad may be required to build a swing or lift bridge.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 91; Dec. Dig. § 20.*]

2. NAVIGABLE WATERS (§ 20*)—BRIDGES—FRANCHISES.

Under Buffalo City Charter, Laws 1891, c. 105, § 404, declaring that any bridge heretofore built over the Buffalo river is a lawful structure, and section 405, as amended by Laws 1900, c. 571, and supplemented by Laws 1906, c. 527, authorizing the city to improve the river, and providing that a railroad crossing any improved channel of the river must construct or rebuild and maintain its bridges in the manner prescribed by the council, etc., the city providing for the improvement of the river may require a railroad maintaining a useless fixed bridge over the river to rebuild by building a swing or lift bridge, and the city may prevent the rebuilding of a fixed bridge.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 91; Dec. Dig. § 20.*]

3. NAVIGABLE WATERS (§ 26*)—BRIDGES—FRANCHISES—REMEDIES.

The city of Buffalo may maintain a suit to restrain a railroad maintaining a bridge over the Buffalo river from rebuilding the bridge as a fixed bridge, but rebuilding it by building a swing or lift bridge, though the notice served on the railroad is insufficient or prematurely served within Laws 1906, c. 527, authorizing the city to improve the river, and requiring railroads to construct their bridges as may be determined by the city, etc.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 135; Dec. Dig. § 26.*]

McLennan, P. J., dissenting.

Appeal from Special Term, Erie County.

Action by the City of Buffalo against the Delaware, Lackawanna & Western Railroad Company and another.   From a judgment at the Special Term (60 Misc. Rep. 584, 112 N. Y. Supp. 690) for plaintiff and against defendants, restraining the latter from building a fixed bridge, defendants appeal.   Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

L. L. Babcock, for appellants.
Samuel P. Moran, for respondent.

KRUSE, J. In 1882 the common council of the city of Buffalo granted to the defendant the New York, Lackawanna & Western Railway Company permission to lay and maintain two tracks from the easterly line of the city, along and across certain streets, and over and across Buffalo river at two designated points, upon certain stated terms and conditions. But no condition was imposed as regards the kind or character of bridges over the river or in respect of the manner of crossing the same, save that it was provided that in its approaches to the river the company should leave such openings in its roadway as, in the judgment of the city engineer, would be sufficient to readily pass the waters of the river at all times.

Thereafter, and in the same year, the said railroad company constructed two fixed bridges across the river, and said railroad company and its lessee and codefendant have used the same in the transportation of cars and trains over the river. One of the bridges is known as the "upper" and the other as the "lower" bridge. Litigation has arisen over the renewal or rebuilding of each bridge. The action relating to the upper bridge was before this court on appeal two years ago. City of Buffalo v. D., L. & W. R. R. Co. and New York, Lackawanna & W. Ry. Co., 126 App. Div. 125, 110 N. Y. Supp. 488.

The present controversy relates to the lower bridge. It is a truss bridge, carrying two railroad tracks, having two spans, each 106.70 feet in length, resting upon two masonry abutments and one pier, and with a clearance of 14 feet and 6 inches above normal water level. The natural life of the bridge is from 25 to 30 years. The bridge is about worn out, and the present traffic requires a stronger bridge than formerly, so that it has become necessary to build practically a new bridge.

The defendant railroad companies admit the necessity of rebuilding the bridge, and propose to build another fixed bridge, a plate girder bridge, heavier and stronger than the old one. They propose to remove the old superstructure entirely and make the necessary changes in the abutments and pier to accommodate the new superstructure. Plans for such a bridge, together with an application by the railroad companies for permission to build the same, were submitted to the common council of the city; but the application was denied. The city objects to a fixed bridge and insists that the railroad companies, in rebridging the stream, must build a swing or lift bridge.

The action is brought to restrain the building of such a fixed bridge. The trial court held that the bridge which the defendants proposed to erect would be an unlawful structure and a nuisance, and directed judgment, among other things, restraining the building of such bridge, suspending, however, the injunctive provisions for a period of 18 months from the entry of judgment, and permitting application to be made to the court on the foot of the judgment for further sus-

pension of the injunctive provisions if it should appear that the necessities of river improvement work and navigation do not demand a swing or draw bridge.

Buffalo river was declared a public highway within the city of Buffalo by an act of the Legislature, passed in 1832 (Laws 1832, c. 179, § 40); that act being the first charter of the city. That provision has been retained, in substance, in the various charter revisions passed by the Legislature since that time, and the trial court finds that the river within the limits of the city is a navigable waterway of the United States, and is a public highway and highway of commerce and navigation between ports and points in the several states of the United States as well as foreign countries.

The river within the city has but little fall. It is winding and tortuous in its course, except where it has been improved; usually sluggish in its flow, but overflows periodically with disastrous results. Not only is the channel itself insufficient to carry off the water, but the flow of the waters is impeded by sand bars and other obstructions in the channel. Evidently for the double purpose of making the river more serviceable for navigation and relieving the flood conditions, the Legislature has imposed upon the city certain obligations and delegated to it certain powers for improving the river.

The charter of the city was revised from time to time. The present charter was passed in 1891 (Laws 1891, c. 105), and the city was specifically authorized therein to widen, straighten, enlarge, clear from obstructions, dredge, deepen, and put and maintain in navigable condition the Buffalo river. Laws 1891, c. 105, § 405. By chapter 571, of the Laws of 1900, this section was further amended by empowering the city to construct new drainage channels to abate floods and prevent overflow of the waters of the river. These provisions were supplemented by the Legislature in 1906 (Laws 1906, c. 527), by providing a comprehensive scheme for improving the river. The act declares the periodical overflow of the river and flooding of the adjacent lands to be a public nuisance, and the city is authorized to abate the same. It adds to the specific powers contained in the charter by providing that the city is authorized to widen, straighten, enlarge, clear from obstructions, dredge, deepen, embank, and dike the river, alter the courses of the river, construct new channels for the same, and put the river in navigable condition within the limits of the city. It requires the common council of the city to adopt a general plan for such work or improvement, with authority to make such changes or modifications of the same as it may from time to time deem necessary or advisable. It permits the work to be done in sections, and different parts may be done at different times and in such manner as the common council shall deem most advantageous for the city. It also authorizes the city to acquire, by purchase or eminent domain proceedings, such lands or rights therein as may be necessary, and even lands held or owned for public use by corporations having the power of eminent domain, or otherwise held or used for public purposes, may be so taken and acquired by the city. It further provides for meeting the expense of the improvements, no more than one-third of which shall

be paid out of the general fund and the remainder by local assessment upon the lands benefited.

Sections 9 and 10 of the act are as follows:

"Sec. 9. Whenever it shall be necessary for any railroad to cross such proposed new or improved channel of the Buffalo river, the corporation owning or operating such railroad shall construct or rebuild and maintain its bridges over said channel at its own expense; and whenever said city shall acquire lands from any railroad corporation for any of the purposes herein mentioned, no compensation or damages shall be awarded to said corporation for the expense of constructing or rebuilding and maintaining such bridge or bridges or any other structure built or to be built to enable said corporation to carry its tracks over said channel. All bridges constructed or rebuilt over such proposed new or improved channel of Buffalo river shall be such bridges as may be determined upon by said common council. Temporary bridges or other structures to carry said railroad tracks over said channel, and which will permit the carrying out of the work or improvement provided for herein, may be constructed by said railroad corporations, and may be maintained until such reasonable time as may be necessary to allow said corporations to construct their permanent bridges, not exceeding one year from the completion of the channel at the point where said tracks cross the same.

"Sec. 10. The said commissioner of public works shall cause to be served upon any railroad corporation, whose tracks cross said proposed new or improved channel, six months prior to the doing of any work by the said city which will interfere with the traffic on said railroad, a notice requiring said corporation to maintain its tracks by means of a bridge or other suitable structure, which will not prevent the construction of such channel. If said corporation neglects or refuses to comply with the terms of said notice said city may institute mandamus, or other suitable proceedings, in any court of competent jurisdiction to compel said corporation to comply with the terms of said notice. Said corporation failing or refusing to comply with the terms of said notice shall also be liable to a fine of one hundred dollars for each day so neglecting or refusing to comply therewith, in an action or actions to be instituted by said city in any court of competent jurisdiction."

Acting under the provisions of this act, the common council adopted a general plan as therein provided (which was also approved by the Secretary of War of the United States, acting under the provisions of Act Cong. March 3, 1899, c. 425, § 9, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3540]), and determined that only draw or swing bridges should be constructed across such new or improved channels. The commissioner of public works caused notice of such determination to be served upon the defendants and all other railroad companies affected by the action of the common council.

In this connection other provisions of the city charter should be referred to. As has been stated, the provision declaring Buffalo river to be a public highway has been in the city charters from the first. In 1884 the section containing that provision was amended (Laws 1884, c. 201) to read as follows:

"Sec. 15. Buffalo river, within the city, is a public highway, and any swing or draw bridge heretofore or hereafter built over the same within the city, by authority of the common council of said city, is a lawful structure."

When the present city charter was enacted, that section was again amended, and reads as follows:

"Sec. 404. Buffalo river, within the city, is a public highway, but any bridge heretofore built and now existing over the same, within the city, by authority of the common council, is a lawful structure. * * *"

The defendants claim that under the provisions of this section they have the right to rebuild the bridge as proposed, and contend further that the grant from the city to the railroad company, under which the bridge was constructed, having been accepted by the company, is a contract, that the rights and privileges thereby given are irrevocable, and that the right to erect and maintain the bridge includes the right to renew and rebuild it.

We may consider the last point first. Assuming the grant or franchise to be a contract binding alike upon both parties thereto, and that the right to maintain includes the right to rebuild the bridge, as I think we must, it does not follow that the railroad company has the right or that the city may require the bridge to be rebuilt precisely as it was originally. If that be true, the city could prevent the building of the proposed structure upon the ground alone that it is not like the original, which is a truss bridge, while the proposed bridge is a plated, girder bridge, although perhaps substantially alike so far as relates to the question under consideration. Both are fixed bridges, and that is the point in controversy.

I am of the opinion that the company did not acquire the right under its grant or franchise from the city to perpetually maintain a fixed bridge over the river, regardless of the requirements of the public in the use of the river as a highway and waterway for commerce and navigation. I think the Legislature neither intended to delegate to the city, nor has the city assumed to grant the right to the railroad company, absolutely and perpetually, to maintain a fixed bridge over the river; but that such right was upon the implied condition that the company might build its bridge over the stream, subject to the future as well as to the then requirements of the public use, and that there remained in the state the right to improve the stream, make it more serviceable as a public highway, and increase its navigability as an avenue of commerce and navigation, and that the railroad company took its right subject thereto and is required to meet all reasonable requirements of the state, from time to time, as the conditions change and the public use of the river increases. As was said in Delaware, Lackawanna & Western Railroad Company v. City of Buffalo, 158 N. Y. 266, 272, 53 N. E. 44, 45:

"The learned counsel for the plaintiff contends that since the structure has the sanction of legislative and municipal authority it cannot in law be an obstruction or a nuisance which the common council may remove. The assertion that this bridge has the sanction of legislative authority is not quite correct. It is true that railroad companies are authorized to construct their roads across, along, or upon any street or highway in a city with the assent of the municipal authorities. That is simply a general authority to cross streets with the consent of the local authorities. When a railroad company relies upon a legislative act as a justification for an encroachment upon public or private rights, or, as in this case, as a justification for the occupation with its piers and abutments of a public highway, it must show that the statute authorized in express terms or by clear and unquestionable implication the doing of the very acts complained of, or that the statute was imperative and could not be executed without causing a nuisance. The

plaintiff had general legislative authority to cross the street in question, but it had no express authority to occupy a large portion of the public highway with abutments and piers for the support of its structure to the great inconvenience and detriment of the public. Nothing less than express authority to place these obstructions in the street will shelter the plaintiff from the consequences of creating a nuisance by the obstruction of a public highway."

It is true that that case related to an obstruction in a street, but I can see no difference in principle between a street and a stream which is a public highway.

In People ex rel. City of Geneva v. Geneva, Waterloo, Seneca Falls & Cayuga Lake Traction Company, 112 App. Div. 581, 98 N. Y. Supp. 719, affirmed 186 N. Y. 516, 78 N. E. 1109, where a street railway company's tracks were laid in a city street under a franchise from the municipality, and located according to the resolution of the municipal authorities, it was held that, notwithstanding such franchise and resolution, the municipal authorities in improving the streets could require the railway company to change the line of its tracks, remove the tracks, and alter the grade, made necessary in paving and grading the street. It was there urged that the franchise granted by the city and the resolution fixing the location of the tracks was a contract binding-upon the city as well as the railway company, the latter having accepted the franchise and located its tracks according to the resolution. In referring to this claim, McLennan, P. J., in the opinion of the court, says:

"Giving full recognition to the principle contended for by the appellant, that the franchise which it obtained from the relator constituted a contract which was under the protection of the provisions of the Constitution of the United States, we consider it well settled by authority that such contract was accepted by defendant subject to the police power of the municipality to regulate the manner in which it should use the streets of such municipality."

In the case of American Rapid Telegraph Company v. Hess et al., 125 N. Y. 641, 26 N. E. 919, 13 L. R. A. 454, 21 Am. St. Rep. 764, where the plaintiff corporation had constructed telegraph lines in the streets of the city of New York, under certain acts authorizing such telegraph companies to construct lines upon any of the public roads and highways, and across any of the waters in this state, it was argued by the telegraph company that its franchise to use the street became a contract which was protected by the federal Constitution, and that it could not be compelled to remove its poles and wires from the streets and put its wires underground, except upon compensation to be made to it. But the Court of Appeals held that the grant, if any, was made in reference to the streets and their maintenance and regulation as such; that when the wires and poles became a serious obstruction in the streets they could be removed, and the streets restored to their usefulness as streets for public purposes.

In the case of Chicago, Burlington & Quincy Railway Company v. Illinois ex rel. Grimwood, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, it appeared that the railway company had lawfully constructed a bridge over an unnavigable stream, running through a swamp. Thereafter the drainage commissioners found that it would

be necessary to deepen and enlarge the stream and make a greater opening under the bridge for the increased amount of water resulting from the drainage improvement. The question there was whether the railway company should construct such a bridge at its own cost, as was necessary to carry out the plans of the drainage commissioners; the contention of the company being, as the bridge was lawfully constructed, and as the depth and width of the channel under it was sufficient at the time to carry off the water of the stream as it then and subsequently flowed, the company could not be required to reconstruct the bridge without compensation, that a compliance with such a requirement was the taking of its property for public use without compensation and therefore without due process of law. But the federal Supreme Court held otherwise, and decided that the railway company must reconstruct the bridge at its own cost, to meet the requirements of the drainage plan.

As will be observed, in all the cases above cited the hardship to the corporations affected was greater than here. There, substantial changes were required to be made in existing structures or conditions, merely to meet changed conditions in the streets or stream, to increase their efficiency for public use. Here, the existing structure has become unfit for railroad use, and a new structure is necessary to accommodate the railroad transportation over the river, and the question is simply whether the railroad companies in rebridging the river shall build such a structure as will make it possible to improve and use the river in the interest of the public welfare.

I think that may be required of the defendant railroad companies without invading any right guaranteed to them by the Constitution. It is very likely true that the use of swing or lift bridges will to some extent impede railway commerce and public transportation; but whether upon the whole the general public welfare will be subserved and the best interests of the city promoted thereby is a question for the Legislature and the municipal authorities, and not for the judiciary. We only decide that the Legislature has the right to require that to be done.

2. It is contended, however, that the Legislature has not made any such requirement, but has expressly declared such a bridge as the old bridge to be a lawful structure; and that it is not proposed to build a new bridge. That claim is founded upon the provisions of section 404 of the city charter, which declares that any bridge heretofore built and now existing over the river is a lawful structure. The position of the learned counsel for the defendants, as I understand it, is this: That the bridge proposed to be built is not a new bridge, but merely the renewing of a bridge built before that provision of the charter was passed, and then in existence; that the right to build the bridge carries with it the right to renew and even rebuild it; and that therefore the proposed structure is a lawful structure according to the express declaration of the Legislature.

Of course, if counsel is right in that contention, obviously all fixed bridges across the river will remain, unless there is other or further legislation upon the subject, and thus effectually, or at least to some

extent, prevent the improvement of the river and hinder its usefulness for public service.

That provision, however, must be read in connection with the next succeeding section (section 405) and the amendment thereto in 1900, and the supplemental act of 1906 heretofore referred to. By section 405 as amended, the city is authorized to widen, deepen, enlarge, clear from obstructions, and to put and maintain the river in navigable condition, and construct new drainage channels. And the act of 1906 is still more comprehensive and specific in empowering the city to make changes in and improve the river. As we have seen, it is there provided that whenever it shall be necessary for any railroad to cross any such proposed new or improved channel of the river, the railroad company shall construct or rebuild and maintain its bridges over the channel at its own expense, and that all bridges constructed or rebuilt over such proposed new or improved channel shall be such as the common council may determine, and authorizes temporary bridges to be built to permit carrying out the work of improvement provided for by the act, which may be maintained until such reasonable time as may be necessary to allow the company to construct permanent bridges, not exceeding a year from the completion of the channel at the point where the tracks cross the same.

It is unnecessary to decide whether the railroad companies can be required to remove and reconstruct at their own expense fixed bridges which interfere with or obstruct the proposed improvement, before they become unfit or need to be replaced for railroad service. But I think that where a bridge, although constructed before the charter went into effect, has become unfit, or for any other reason it becomes necessary for the railroad company to reconstruct or rebuild practically the bridge anew, as is proposed and has become necessary here, the bridge so constructed and rebuilt is not an existing bridge within the provisions of section 404 of the city charter. In any event, I think, under the provisions of section 405 as amended, and the supplementary act of 1906, the city has the right to prevent the erection of such a structure and require a swing or lift bridge, if it is reasonably necessary in improving the river and using it as a public thoroughfare.

The facts in this case are unlike those in the case relating to the upper bridge. City of Buffalo v. D., L. & W. R. R. Co., and N. Y., L. & W. Ry. Co., supra. There it appeared that a plan had been adopted by the city which would so change the channel of the river as to result in abandoning the old channel at the point where that bridge was located, and in that event the building of a swing or lift bridge over the old channel would serve no useful purpose; and the decision was placed upon the ground that it would be inequitable, under such circumstances, to require the railroad company to incur the largely increased expense of constructing and maintaining a swing or lift bridge, without determining the questions here discussed and declining to hold that the railroad company may not be required to remove the fixed bridge, if constructed, in case it becomes an obstacle to the development of the river.

It is contended here that the present plan does not show that the river will be improved at the point where the bridge is located. I

think the modified plan adopted by the common council and approved by the mayor shows that the river will be improved at the point where the bridge is located. Of course, it is possible that the plan may be further modified, and that it may be some time before the improvement will reach this point in the river, but that is fully taken care of by the provision in the judgment which stays the injunctive provisions for a period of 18 months, with the privilege to the defendants of making application for a further stay if the work of improving the river shall not demand lift or swing bridges. The city seems to be content with this provision, as it has not been appealed from.

The point is also made on behalf of the appellants that if plan C was modified, as the city claims it was, before the notice was served by the commissioner of public works, the notice is ineffectual under the act of 1906, and urged that the remedy provided for in the act of 1906 is exclusive. It is to be observed, however, that this action is not to recover a penalty or a proceeding to remove a bridge, as provided for in that act. It is to prevent the erection of an improper bridge. Even if the notice was insufficient or prematurely served to maintain the action or proceeding provided for in that act, I think this action is maintainable. The notice apprised the defendant railroad companies of the action of the common council in determining that only swing or lift bridges should be erected, and of the improvement to be made. Merely because the modified plan makes it the more necessary to have a swing or lift bridge, and not a fixed bridge, does not, as it seems to me, require the service of another notice as a condition precedent to maintaining this action. ˥

The constitutionality of the act of 1906 is also attacked; but no specific ground is urged, unless it be that it attempts to take from the defendants, without compensation, contract rights which the railroad company acquired under the grant or franchise. But that question has been fully considered and needs no further discussion.

The judgment should be affirmed, with costs. All concur, except McLENNAN, P. J., who dissents.